



DISTRICT COURT — N.D. OF N.Y.

FILED

JAN – 3 2001

AT          O'CLOCK
ncen          man Clerk — Syracuse

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| Rome Ambulatory Surgery Center, LLC; | : |
| Plaintiff, | : |
| v. | : |
| Rome Memorial Hospital, Inc. and Greater Rome Affiliates, Inc.; | : |
| Defendants. | : |

Civil Action No. 01-CV-0023



FJS   GJD

## COMPLAINT

### Introduction

1.      In June of 1999, Plaintiff Rome Ambulatory Surgery Center, LLC introduced

competition into the market for outpatient surgery for the first time in the greater Rome area by

offering patients, physicians, and health plans a high-quality, lower cost alternative to the

outpatient surgery provided at Rome Memorial Hospital.  As a result of Plaintiff's efforts,

residents of the Rome area have been provided a significant choice when they require outpatient

surgery.

2.      Even before Rome Ambulatory Surgery Center opened its doors, Defendants Rome Memorial Hospital, Inc. and Greater Rome Affiliates, Inc. embarked upon a pattern of exclusionary, predatory, and anticompetitive conduct designed to prevent the Rome Ambulatory Surgery Center, Rome Hospital's only significant competitor, from successfully opening, or, alternatively, to drive Rome Ambulatory Surgery Center out of business.

3.      Defendants have sought to eliminate competition through a variety of means, including entering into exclusionary and predatory contracts with health plans; intimidating physicians from using the Rome Ambulatory Surgery Center (including through threats of loss of hospital privileges and referrals); intimidating physicians from referring patients to surgeons who use Rome Ambulatory Surgery Center; and by entering into improper, and in some cases illegal, agreements with certain physicians and physician groups in the greater Rome area containing inducements to such physicians to assist Defendants in their anticompetitive goal of eliminating all competition in the market for outpatient surgery.

4.      As a result of Defendants' illegal conduct, Plaintiff Rome Ambulatory Surgery Center has provided services to substantially fewer patients than it had anticipated serving based on the widespread support third party payors and physicians expressed.

5.      With the loss of Rome Ambulatory Surgery Center's largest contract, effective January 1, 2001, as a result of Rome hospital's illegal conduct, Defendants are now on the verge of achieving their anticompetitive purposes and securing anew Rome Memorial Hospital's monopoly over outpatient surgery in the greater Rome area, to the detriment of the Plaintiff, and the entire Rome community.

**The Parties**

6.      Plaintiff Rome Ambulatory Surgery Center, LLC is a limited liability company organized under the laws of New York State with its principal place of business at 125 Brookley Road, Rome, New York.  Rome Ambulatory Surgery Center, LLC owns and operates the Rome Ambulatory Surgery Center (collectively "RASC") which has been established under Article 28 of the New York Public Health Law and is located at 125 Brookley Road, Rome, New York.

7.      RASC's surgery center occupies approximately 14,400 square feet at the former Griffiss Air Force Base Hospital in Rome, New York under a Sharing Agreement between RASC and the United States Department of Veteran Affairs ("VA").  The VA also provides certain services to RASC under the Sharing Agreement.

8.      Defendant Rome Memorial Hospital, Inc. is a New York not-for-profit corporation that is tax–exempt under Section 501(c)(3) of the Internal Revenue Code with its principal place of business at 1500 North James Street, Rome, New York.  Rome Memorial Hospital, Inc. owns and operates Rome Memorial Hospital (collectively "Rome Hospital"), a general inpatient acute care hospital with approximately 120 licensed acute care beds located at 1500 North James Street, Rome, New York.

9.      Defendant Greater Rome Affiliates, Inc. ("GRA") is a New York not-for-profit corporation that is tax-exempt under Section 501(c)(3) of the Internal Revenue Code with its principal place of business at 1500 North James Street, Rome, New York.

10.      On information and belief, GRA is the sole member of Rome Memorial Hospital, Inc.

**Jurisdiction and Venue**

11.      This action is brought pursuant to Sections 4 and 16 of the Clayton Act (15 U.S.C.

§§ 15 and 26).  Plaintiff seeks monetary and injunctive relief from violations of the antitrust laws

of the United States, specifically, Sections 1 and 2 of the Sherman Act (15 U.S.C. §§ 1,2), as

well as violations of New York State law.  The jurisdiction of this Court is founded on 28 U.S.C.

§§ 1331 and 1367.

       12.      Venue is proper in this district pursuant to 28 U.S.C. § 1391.

## Interstate Commerce

       13.      A large percentage of Defendant Rome Hospital's revenues come from sources

located outside of New York State, including the federal government (through the Medicare and

Medicaid programs).

       14.      On information and belief, Rome Hospital purchases a substantial portion of its

medicine and supplies from sellers located outside of New York State.

       15.      Many employers that have submitted payments to Defendant Rome Hospital

(either directly or through health insurers) sell products or services in interstate commerce.  The

prices paid by those employers for general inpatient care services and outpatient surgery have a

substantial impact on the prices of products and services that those businesses sell within New

York State and in other states.

## General Allegations

       16.      Rome Hospital is the only general inpatient acute care hospital in Rome, New

York.

       17.      Rome Hospital provides facilities for general inpatient acute care and outpatient

surgery.  It is currently the only provider of inpatient surgical facilities and other general

inpatient acute care hospital services in Rome, New York.  Rome Hospital also offers radiology,

laboratory, anesthesia and other services to patients using its facilities.

18.      Freestanding ambulatory surgery centers, like RASC, are designed, equipped and operated specifically for the purpose of performing outpatient surgical procedures for patients, and offer appropriate, less costly surgical services to patients who might otherwise be treated in hospital-based programs.

19.      In April 1996, twenty-three physicians in Rome, New York (the "RASC Sponsors") decided that development of a free-standing ambulatory surgery center in Rome would benefit patients, physicians, and the community by providing state-of-the-art facilities and a convenient, patient-friendly environment; and by creating efficiencies and cost savings to patients and third party payors as an alternative to Rome Hospital for outpatient surgery.

20.      RASC markets its services and facilities to physicians, health plans, and patients. For physicians, RASC emphasizes the advantages it offers including more rapid turnaround time between cases, state-of-the-art surgical equipment, simplified administrative procedures, and the ability to schedule consecutive cases without preemption by inpatient or emergency procedures. The advantages RASC offers to health plans include high quality care, lower cost, and greater convenience.  The advantages for patients include convenience and choice.

21.      RASC has a medical staff of almost 40 physicians, and employs approximately 15 people in various administrative and clinical capacities.

22.      In New York State, the establishment, ownership, construction and operation of ambulatory surgery centers are regulated by the New York State Department of Health. Ambulatory surgery centers must receive a certificate of need ("CON") from the Department of Health prior to beginning construction.

23.      In July, 1996, the RASC Sponsors engaged Harrison Management Resources, LLC ("HMR") to assist them in obtaining a CON, finding a location for the proposed surgery

center and, following the issuance of the CON, financing, constructing and operating the surgery

center. HMR's principals were experienced in all aspects of developing and operating

freestanding ambulatory surgery centers in New York State.

24.      Health plans attempt to reduce costs by entering into contracts with health care

providers and facilities that provide discounts off of the providers' list charges in exchange for

the health plan directing patients to contracted providers, and that secure the providers'

cooperation in monitoring and managing utilization of health care services by the individuals

insured by the health plan. Such contracted providers are usually referred to as participating

providers.

25.      During the process of preparing for review by the Department of Health, the

RASC Sponsors contacted each of the major commercial health plans operating in the Rome

area, including; BlueCross BlueShield of Utica-Watertown ("BlueCross"), MVP Health Plan,

Inc. ("MVP"), and United HealthCare ("United"). The RASC Sponsors contacted these health

plans to determine whether or not they would support and use a freestanding ambulatory surgery

center.

26.      Because of their desire to encourage competition for outpatient surgery in the

Rome area, where none existed at the time, three of the largest commercial health plans in the

Rome area – BlueCross, MVP, and United – provided letters supporting RASC's CON

application.

27.      Health plan representatives said that Rome Hospital had been unwilling to

negotiate with them and that they had experienced difficulties in working with Rome Hospital

because it did not face any competition.

28.      Health plans design their benefits in such a way to require, or strongly encourage,

the people covered by the health plan ("Members") to use only participating providers and facilities.  Generally, health plans steer their Members to participating providers by requiring individuals to pay significantly more, or all, of the cost of services provided by non-participating providers.

29.     When health care providers do not have a participation agreement with a particular health plan, those providers are effectively precluded from providing services to people insured by that health plan.

30.     BlueCross is the largest commercial health plan in Oneida County, covering, through its HMO and indemnity plans, approximately 40 to 45% of the residents of the Rome, New York area who are covered by a commercial health plan.

31.     MVP is the second-largest commercial health plan in Oneida County, covering approximately 20% of the residents of the Rome area covered by a commercial health plan through its HMO and indemnity plans.

32.     Together, Blue Cross and MVP represent approximately 65% of the commercially-insured population of the Rome area.

33.     RASC filed its CON application with the New York State Department of Health in December 1996, pending approval of a new need methodology for evaluating ambulatory surgery center CON applications.  The new need methodology for review of ambulatory surgery center applications was approved by the Public Health Council in October 1997.

34.     Following the submission of RASC's CON application, Rome Hospital began to actively oppose RASC's application and to take certain other actions designed to either delay, or increase the cost of, developing RASC's surgery center.

35.     Rome Hospital filed a letter of opposition that was entered into the record

pertaining to RASC's CON application on January 5, 1998. One of the bases for Rome Hospital's opposition was that there was no need for a surgery center because Rome Hospital had sufficient capacity to meet demand. Yet only one week later, Rome Hospital filed a CON application to expand Rome Hospital's outpatient surgery facilities. Rome Hospital subsequently withdrew its CON application.

36.    As a result of Rome Hospital's aggressive opposition to RASC's CON application, the State Hospital Review and Planning Council deferred its review of RASC's CON application for a period of four months with a directive that RASC and Rome Hospital try to "work together."

37.    RASC and HMR tried to engage Rome Hospital in good faith discussions concerning the development of an ambulatory surgery center that would be jointly owned by RASC and Rome Hospital.

38.    Rome Hospital was initially unwilling to engage in such discussions. Subsequently, Rome Hospital proposed unreasonable conditions to a joint venture that Rome Hospital knew would be unacceptable to RASC, including retraction of RASC's pending CON application.

39.    On June 26, 1998, after a protracted approval process triggered by Rome Hospital's opposition and dilatory tactics, the Public Health Council voted to approve the issuance of the CON for RASC.

40.    Between November, 1998 and January, 1999, RASC raised $1.2 million in equity from the RASC Sponsors and others, and obtained a $1.5 million construction and equipment loan and a $230,000 operating line of credit from Rome Savings Bank to finance the construction, equipping, and initial operations of the surgery center.

41.     Following its construction and equipping of the surgery center, RASC received

approval to commence business operations from the Department of Health on June 8, 1999.


**Specific Allegations**

**The Relevant Markets**

42.     All medical services, including surgical procedures, are performed by physicians.

However, physicians must perform surgical procedures in specialized health care facilities.

43.     Patients requiring general inpatient acute care hospital services, including

inpatient surgical procedures, can obtain those services only from a general inpatient acute care

hospital.  Rome Hospital is the only practicable source of such services for residents of the

greater Rome area.

44.     As a result, Rome Hospital possesses monopoly power in the inpatient general

acute care hospital services market in the greater Rome area.

45.     Outpatient surgery includes surgeries for which the recovery period is less than 24

hours, and for which the post-operative care required is less intensive than the care available in a

general inpatient acute care hospital.

46.     Outpatient surgery can be performed at general inpatient acute care hospitals and

at freestanding ambulatory surgery centers that are licensed by the State of New York.

47.     General inpatient acute care hospitals and ambulatory surgery centers are the only

facilities in which outpatient surgery may be performed.

48.     Prior to RASC commencing business in June, 1999, Rome Hospital was the sole

facility in Rome, New York in which outpatient surgery could be performed.  Consequently,

Rome Hospital possessed monopoly power in the market for outpatient surgery in the greater

Rome area.

49.    Currently, Rome Hospital and RASC are the only practicable facilities available to residents of the greater Rome area in need of outpatient surgery.

50.    On January 1, 2001, Rome Hospital obtained an overwhelming share of the market for outpatient surgery, and, as a result, again has monopoly power in the outpatient surgery market, whether or not RASC remains in business.

**Rome Hospital's Attempts to Prevent RASC from Opening**

51.    Rome Hospital has made clear from the beginning that it did not want an ambulatory surgery center in Rome, New York, especially one that Rome Hospital or its affiliates did not own and control.  Indeed, Rome Hospital made public statements that it did not want competition because it expected to lose up to 50% of its outpatient surgery cases to RASC.

52.    Following the submission of RASC's CON application and continuing through to the present, Rome Hospital has actively and consistently sought to prevent, or alternatively, to eliminate, competition from RASC by entering exclusive contracts with commercial health plans that preclude those health plans from entering provider agreements with RASC; intimidating members of Rome Hospital's medical staff from using RASC's surgery center; and intimidating physicians on Rome Hospital's medical staff from making referrals to surgeons that use RASC. On information and belief, Rome Hospital has engaged in its anticompetitive, predatory, and exclusionary conduct for the purpose of eliminating Rome Hospital's only competition in the market for outpatient surgery.

53.    In an effort to delay or derail RASC's CON application, Rome Hospital refused to enter into a transfer agreement with RASC by which patients receiving services at RASC that require emergency care would be transferred to Rome Hospital.

54.     An ambulatory surgery center seeking CON approval must have a transfer agreement with a general inpatient acute care hospital.  RASC eventually obtained transfer agreements from Oneida Hospital in Oneida, and St. Luke's Hospital in Utica, both of which are substantial distances from RASC.

55.     Rome Hospital's refusal to enter into a transfer agreement with RASC was unreasonable and clearly intended to prevent RASC from obtaining CON approval.  Because most of RASC's medical staff had admitting privileges at Rome Hospital, any of their patients that required emergency care would have been transferred to Rome Hospital irrespective of whether Rome Hospital had entered into a transfer agreement with RASC.

56.     Rome Hospital also sought to prevent RASC's development of a surgery center by interfering in RASC's efforts to enter into a sharing agreement with the VA that would allow RASC to build its surgery center at the former Griffiss Air Force Base Hospital.

57.     Rome Hospital knew from RASC's publicly-available CON application that the costs and time required to develop RASC's surgery center would increase greatly if the surgery center were not located at the former Griffiss Air Force Base Hospital under the terms of the proposed Sharing Agreement.

58.     In order for the VA to provide space and/or services to a private entity under a sharing agreement, the VA is required to hold a public hearing.  At the public hearing held in Rome to discuss the then-proposed Sharing Agreement between RASC and the VA, Alvin White (Rome Hospital's President and CEO), other representatives of Rome Hospital, and so-called "concerned citizens" with whom Rome Hospital had a relationship, all expressed vociferous opposition to the Sharing Agreement.

59.     Notwithstanding Rome Hospital's objections, the VA approved the Sharing

Agreement.

60.     During RASC's development phase, RASC representatives had made clear RASC's desire to make formal arrangements for Rome Hospital to provide pre-operative services for patients scheduled to have surgery at RASC that RASC could not provide.  These pre-operative services include pathology, laboratory, electrocardiograms, and radiology services.

61.     Rome Hospital made it clear that it had no interest in making such arrangements with RASC.  Providing such services for RASC patients could have been quite profitable to Rome Hospital.  There was no apparent rational business justification for Rome Hospital to have foregone the opportunity to generate significant revenue that it might otherwise lose unless Rome Hospital prevented RASC from opening at all.

### Defendants' Attempts to Drive RASC Out of Business

62.     Rome Hospital also knew that RASC would not be a viable competitor without contracts with MVP and BlueCross.

63.     Once it became clear to Rome Hospital that RASC's CON application would be approved and that RASC would be able to open its surgery center, Rome Hospital and its affiliates, including Defendant GRA, immediately embarked on a plan to cripple RASC by, among other things, preventing the large health plans operating in the area (e.g., MVP and BlueCross) from contracting with RASC, and by intimidating physicians from performing surgeries at RASC or from referring patients to physicians on RASC's medical staff.

64.     Anticipating licensure and receiving CON approval to open, RASC contacted MVP, BlueCross, United, and other health plans during the spring of 1999 to negotiate contracts with these health plans so that Members of these plans could use RASC's surgery center.

**Rome Hospital's Exclusive Contract with MVP**

65.    Although MVP had consistently expressed a strong desire to contract with RASC (as had other health plans), MVP informed RASC that it could not enter a contract with RASC because it had just entered into a three-year exclusive agreement with Rome Hospital that, by its terms, prevented MVP from contracting with RASC.

66.    On information and belief, for over a year prior to RASC receiving approval of its CON, MVP had been unable to negotiate a contract with Rome Hospital that would provide, among other things, a per-diem reimbursement methodology for inpatient services and discounts for outpatient services.

67.    On information and belief, once it appeared that RASC would be able to open and provide outpatient surgery in competition with Rome Hospital, Rome Hospital contacted MVP and offered to enter into an exceptionally favorable contract with MVP on the condition that Rome Hospital be the exclusive provider of outpatient surgery in Rome, New York, and that no outpatient surgery would be performed at RASC during the three-year term of the contract.

68.    On information and belief, the contract that Rome Hospital entered with MVP included a number of terms that Rome Hospital had refused to accept or even consider prior to RASC's likely entry into the outpatient surgery market.  Many of these terms were quite favorable to MVP, including substantial discounts on outpatient surgery, reimbursement of inpatient services on a per diem basis (resulting in substantially lower costs to MVP), and a fixed three-year term.

69.    On information and belief, Rome Hospital required MVP to enter an exclusive contract for outpatient surgery as a condition to Rome Hospital agreeing to a contract with MVP covering inpatient general acute care hospital services and ancillary services at a lower

reimbursement rate.

70.     On information and belief, MVP's contract with Rome Hospital is an exclusive, three-year agreement that prohibits MVP from entering into a provider agreement with RASC.

71.     On information and belief, the terms of Rome Hospital's contract with MVP, at the time that it was entered into, were substantially more favorable to MVP than Rome Hospital's contracts with MVP's competitors.

72.     Because MVP does not have a contract with RASC, MVP's Members cannot choose to have their surgeries performed at RASC without incurring significant financial penalties. The effect of such financial penalties is to preclude MVP's Members from using RASC.

73.     Rome Hospital's exclusive contract with MVP prevented RASC from competing to provide outpatient surgery for MVP's Members, caused substantial economic harm to RASC, and put RASC's long-term financial viability in significant jeopardy.

74.     RASC's initial financial projections were based on RASC having a fair opportunity to compete for MVP's, BlueCross', and other health plans' Members. Consequently, RASC's exclusion from participating in the MVP contract significantly diminished the number of procedures that RASC has been able to perform, and has adversely affected RASC's payor mix.

**The Loss of the BlueCross Contract**

75.     In the spring of 1999, RASC also contacted BlueCross to negotiate a contract that would allow BlueCross' Members to use RASC for outpatient surgery.

76.     BlueCross had been very supportive of RASC's CON application and had expressed a strong desire to have RASC as one of its participating providers.

77.     On information and belief, in the spring of 1999 Rome Hospital had offered BlueCross a contract comparable to Rome Hospital's contract with MVP on the condition that BlueCross not enter a contract with RASC.  BlueCross refused Rome Hospital's offer.

78.     In June, 1999, BlueCross entered into a non-exclusive provider agreement with RASC containing reimbursement rates that were favorable to BlueCross and, on information and belief, were substantially lower than those charged by Rome Hospital for comparable services.

79.     On information and belief, the reimbursement rates for general inpatient acute care services and outpatient surgery, and the other terms of the MVP contract with Rome Hospital are substantially more favorable than the arrangement Rome Hospital had with BlueCross prior to January 1, 2001.

80.     The BlueCross provider agreement with RASC was for an initial term expiring on December 31, 2000.  However, like other BlueCross provider agreements, BlueCross' agreement with RASC automatically renewed for one-year terms unless terminated by either party upon sixty days written notice to the other party.

81.     RASC's provider agreement with BlueCross provided very significant discounts as an incentive for BlueCross to encourage its Members to use RASC for outpatient surgery.

82.     Nevertheless, the number of BlueCross Members that have had outpatient surgeries performed at RASC has been significantly lower than both BlueCross and RASC had anticipated.

83.     On information and belief, Rome Hospital's explicit and implied threats against physicians who use, or refer patients to RASC, and its improper and anticompetitive relationships with certain physicians and physician groups have prevented RASC from providing outpatient surgery to as many BlueCross Members as BlueCross and RASC expected.  This same

conduct by Rome Hospital has also significantly limited the number of surgeries RASC has performed on patients insured by other public and private payors.

84.     During the fall of 2000, BlueCross and RASC engaged in discussions to modify certain terms of the provider agreement for the year 2001.

85.     On information and belief, the favorable rates and terms in MVP's contract with Rome Hospital (which Rome Hospital had given to MVP in exchange for MVP's exclusion of RASC) put BlueCross at a significant competitive disadvantage compared with MVP, BlueCross' most significant competitor in the Rome area.

86.     On information and belief, the competitive disadvantage at which BlueCross found itself because it had not excluded RASC was a primary factor in BlueCross' decision to terminate its contract with RASC.

87.     On information and belief, Rome Hospital knew that the contract between BlueCross and RASC was up for renewal, and again sought to eliminate competition from RASC by offering an exclusive contract to BlueCross.

88.     On October 30, 2000, BlueCross notified RASC that BlueCross was terminating its provider agreement with RASC, and that as of January 1, 2001 BlueCross Members would no longer be able to use RASC.

89.     On information and belief, Rome Hospital offered BlueCross a contract providing for significant discounts on all services, including inpatient services, on the condition that all BlueCross Members have their outpatient surgeries performed at Rome Hospital.

90.     On information and belief, Rome Hospital required that BlueCross contract with Rome Hospital exclusively for outpatient surgery as a condition to entering a contract for inpatient services and other services for which Rome Hospital does not face any competition.

91.     On information and belief, the more favorable business arrangement offered to BlueCross, conditioned on all BlueCross outpatient surgeries being performed at Rome Hospital, was the reason BlueCross decided to terminate its provider agreement with RASC.

92.     BlueCross Members represent approximately 25% of RASC's volume.

93.     As of January 1, 2001, BlueCross Members cannot choose to have their outpatient surgeries performed at RASC without incurring significant financial penalties.

94.     On information and belief, shortly before RASC received the termination notice from BlueCross, Rome Hospital's President and CEO, Alvin White, made statements that RASC would be out of business in a short time.

95.     On information and belief, Rome Hospital entered the exclusive contract with BlueCross with the specific intent of driving RASC out of business and re-gaining its monopoly over outpatient surgery in the greater Rome area.

**Physician Intimidation**

96.     Physicians require staff privileges at Rome Hospital in order to treat patients and perform surgery, including outpatient surgery, at Rome Hospital.

97.     RASC surgeons who also have medical staff privileges at Rome Hospital derive a substantially higher percentage of their incomes from surgeries performed at Rome Hospital than surgeries performed at RASC.  Consequently, loss of medical staff privileges at Rome Hospital would be financially devastating to such physicians.

98.     Rome Hospital has taken actions to prevent physicians from using RASC, and to prevent physicians from referring to surgeons who use RASC.

99.     Rome Hospital has amended its Bylaws governing the hospital and medical staff to provide a mechanism for Rome Hospital to punish physicians that compete with it, or that

have any relationship with a competitor of the hospital.

100.   On information and belief, this change in the Bylaws was specifically aimed at members of Rome Hospital's medical staff who were owners of RASC.

101.   Specifically, Rome Hospital changed the Bylaw provisions governing the granting or renewal of hospital privileges to allow the hospital to consider the existence of a relationship between the physician and a competitor of Rome Hospital in the decision whether or not to grant or renew staff privileges to a physician.

102.   Section 1.4 of the Rome Memorial Hospital Bylaws provides in pertinent part as follows:

> 1.4   Board Authority: Assessment of Hospital Needs
>
> The Board of Trustees may deny, withhold or terminate an appointment or deny, withhold, terminate or diminish clinical privileges for cause. Although an open staff policy shall generally prevail, consideration of appointment or reappointment, as the case may be, and the granting of clinical privileges may, in the discretion of the Board, also involve the following criteria:
>
> > (b)   The nature and extent of an ownership or investment interest held by the applicant or a member of his/her family in any health care facility, which is in direct competition with the Hospital.

103.   According to Section 1.5 of the Bylaws, these same criteria may be applied by the Rome Hospital Board of Trustees when approving the selection of department heads, any committee chair, and Medical Staff Officers. These same criteria may also be used by the Board of Trustees to remove a physician from any such positions.

104.   Members of RASC who are also members of Rome Hospital's medical staff are aware of these Bylaw provisions and understand that Rome Hospital changed the Bylaw provisions to threaten physicians with a loss of hospital privileges if they use, or refer, patients to RASC.

105.    On information and belief, the explicit nature of the threat contained in Rome Hospital's Bylaws has intimidated Rome Hospital's medical staff generally, and prevented physicians who are not members of RASC from using RASC or referring patients to surgeons who perform surgery at RASC.

106.    As a result, fewer than one-half of the physicians with medical staff privileges at RASC have ever performed a surgical procedure at RASC in the eighteen months that the surgery center has been in operation.

107.    In addition, Alvin White, Rome Hospital's President and CEO, has exhorted Rome Hospital's medical staff and employees on several occasions not to support RASC in any way.

108.    Under the laws of the State of New York, patients must be provided freedom of choice in selecting the health care facilities at which they will receive treatment.

109.    A number of physicians have stated that they would offer their patients the option of having surgery performed at RASC, or would perform surgery at RASC, if Rome Hospital's Bylaws did not threaten them with the loss of their hospital privileges for so doing.

110.    Threats by Rome Hospital have clearly and significantly altered the referral decisions and patterns of Rome area physicians who would otherwise use RASC, or refer patients to surgeons who perform surgeries at RASC.

**Physician Relationships**

111.    Rome Hospital, GRA and one or more of their affiliates have had, and currently have financial relationships with individual physicians and physician groups that practice in the Rome, New York area.  These physicians directly or indirectly refer their patients to Rome Hospital.

112.     On information and belief, Rome Hospital has caused, through direct and indirect financial relationships and other inducements, certain individual physicians and physician groups as yet unidentified (the "Cooperating Physicians") to (a) refer outpatient surgeries to Rome Hospital instead of RASC; (b) refuse to cooperate with, or refer patients to, physicians that use RASC; and (c) otherwise assist Rome Hospital in its efforts to eliminate competition from RASC.

113.     On information and belief, one of the principal reasons for many of Rome Hospital's, GRA's, and their affiliates' anticompetitive and improper relationships with the Cooperating Physicians was to secure their cooperation and assistance in Rome Hospital's efforts to drive RASC out of business, and to maintain Rome Hospital's monopoly in those services in which it is the sole provider.

114.     On information and belief, one of the reasons that the Cooperating Physicians affiliated with Rome Hospital was that Rome Hospital threatened to recruit new physicians to Rome to compete with the physicians if they did not affiliate and cooperate with Rome Hospital.

115.     On information and belief, the Cooperating Physicians agreed that they would not compete with Rome Hospital in providing outpatient surgery and various ancillary services, and that the Cooperating Physicians would assist in Rome Hospital's efforts to prevent or eliminate competition for such services from other entities, such as RASC, in return for Rome Hospital's agreement that it would not recruit physicians into the Rome area to compete with the Cooperating Physicians.

116.     On information and belief, these actions represent a market allocation agreement between Rome Hospital and the Cooperating Physicians, and are part of a conspiracy to drive RASC out of business.

117.    Rome Hospital and the Cooperating Physicians have each taken significant actions in furtherance of this conspiracy to eliminate competition and allocate markets.

118.    For example, on information and belief, Rome Hospital has recruited a number of physicians to the Rome area since entering the agreements with the Cooperating Physicians. However, new physicians recruited to the area by Rome Hospital have been informed that they would be expected to join certain physician groups, even though Rome Hospital provided the generous salary guarantees and incurred significant recruitment costs in order to recruit the physicians.

119.    On information and belief, Rome Hospital has provided its resources and assistance in recruitment of new physicians, and has provided additional financial and other benefits to only a select group of physicians and physician groups.

120.    On information and belief, Rome Hospital has provided such benefits and services to the Cooperating Physicians as an inducement to cooperate in Rome Hospital's plan to drive RASC out of business, and in furtherance of the market allocation agreements between Rome Hospital and the Cooperating Physicians.

121.    On information and belief, the Cooperating Physicians have, in turn, refused to refer patients whenever possible to surgeons who perform surgeries at RASC.

122.    Some of the Cooperating Physicians have also repeatedly refused to provide patients who were planning to have their outpatient surgeries performed at RASC with the necessary pre-operative examinations.  Thus, in order for such patients to obtain the pre-operative exams, they must have their outpatient surgeries performed at Rome Hospital.

123.    Some of the Cooperating Physicians have also threatened surgeons with the loss of referrals unless those surgeons perform all of their outpatient surgeries at Rome Hospital.

124.   The refusal of the Cooperating Physicians to provide pre-operative exams on patients whose surgeries were scheduled at RASC, and those physicians' threats of loss of referrals have prevented many patients and physicians who had elected to use RASC, or would prefer to use RASC, from using RASC's facilities.

125.   On information and belief, some of the Cooperating Physicians threatened to cease making referrals to certain surgeons who were considering investing in RASC and, as a result of such threats, such surgeons ultimately did not invest in RASC.

126.   The actions of the Cooperating Physicians in furtherance of the conspiracy and market allocation agreements with Rome Hospital have significantly altered the referral patterns and decisions of patients and physicians relating to outpatient surgery services.

127.   By virtue of the conspiracy and agreement to allocate markets between Rome Hospital and the Cooperating Physicians, both Rome Hospital and the Cooperating Physicians have benefited significantly: (a) Rome Hospital has been able to prevent meaningful competition from RASC; (b) Rome Hospital and the Cooperating Physicians have obtained a controlling majority of the Rome Hospital medical staff; and (c) Rome Hospital and the Cooperating Physicians have been able to foreclose actual and potential competition from other sources.

**Harm to Competition and Antitrust Injury**

128.   Rome Hospital's previous unwillingness to enter, or even negotiate, contracts with health plans that included discounts, utilization controls, or other terms that could control costs prior to RASC opening provides a clear example of what will happen if Defendants' anticompetitive conduct goes unchecked, and Plaintiff goes out of business.

129.   During the period of competition between RASC and Rome Hospital, competition

resulted in greater choice, higher quality, and lower prices for outpatient surgery to the benefit of consumers, commercial health plans, and area employers.

130.     Defendants' anticompetitive conduct in violation of the antitrust laws is likely to eliminate RASC as an effective competitor in the market for outpatient surgery, and, as a result, to eliminate the only effective constraint on Rome Hospital's prices for outpatient surgery.

131.     As a result of Defendants' anticompetitive conduct, patients and physicians will lose a high-quality, efficient, low-cost alternative for outpatient surgery if RASC goes out of business.

132.     Once Rome Hospital has achieved its goal (eliminating RASC as a competitor), past experience indicates that Rome Hospital will no longer offer discounts and will likely raise prices to health plans and patients above competitive levels.  Moreover, health plans, patients, and physicians will lose the benefits inherent in having a choice of outpatient surgery providers.

133.     In addition, RASC is a more efficient setting for outpatient surgeries than Rome Hospital.  For example, the time needed to prepare an operating room for the next surgery is significantly shorter at RASC than at Rome Hospital.  The turn around time for operating rooms at RASC is about one-quarter of the turn around time at Rome Hospital.

134.     The efficiency offered by RASC is a significant benefit to surgeons by reducing downtime and allowing physicians to perform a greater number of procedures in a day.

**Injury and Damages to RASC**

135.     As a result of Defendants' anticompetitive conduct, RASC will lose its investment in the surgery center and the profits that it would have earned had the surgery center become a viable competitor.  In fact, RASC's revenues and profits while it has been in operation have been significantly lower than they would have been absent Defendants' anticompetitive conduct.

136.    This conduct by Defendants has harmed the Plaintiff and, if not stopped, will continue to harm the Plaintiff, in an amount estimated at $4,000,000, as well as harming employers and consumers.  Indeed, RASC may be forced to discontinue operations shortly as a result of Defendants' conduct.

137.    Plaintiff has suffered and will continue to suffer financial harm as a result of the Defendants' conduct.  Moreover, as previously stated, consumers and competition have been, and will continue to be injured, as a result of the loss of choice, and the loss of competition, which will lead to higher prices if RASC is driven from the market.

## Cause of Action I
## Tying Contract in Restraint of Trade

138.    Plaintiff hereby repeats each and every allegation contained in the foregoing paragraphs.

139.    The relevant markets for the purposes of this claim are the general inpatient acute care hospital services and the outpatient surgery markets in the greater Rome area.

140.    Defendant Rome Hospital possesses market power in the general inpatient acute care hospital services market.

141.    Defendant Rome Hospital has required, either directly or indirectly, that health plans contract with Rome Hospital for outpatient surgery services on an exclusive basis as a condition to Rome Hospital entering a contract for general inpatient acute care hospital services on a discounted basis.

142.    Defendant Rome Hospital has no legitimate business justification for its conduct.

143.    This conduct constitutes a tying arrangement or contract that unreasonably restrains trade in violation of Section 1 of the Sherman Act.

144.    Defendants' conduct has caused Plaintiff both monetary and other damages.

## Cause of Action II
## Per Se Illegal Tying Contract

145.    Plaintiff hereby repeats each and every allegation contained in the foregoing paragraphs.

146.    The relevant markets for the purposes of this claim are the general inpatient acute care hospital services and the outpatient surgery markets in the greater Rome area.

147.    Defendant Rome Hospital possesses market power in the general inpatient acute care hospital services market.

148.    Defendant Rome Hospital has required, either directly or indirectly, that health plans contract with Rome Hospital for outpatient surgery services on an exclusive basis as a condition to Rome Hospital entering a contract for general inpatient acute care hospital services on a discounted basis.

149.    This conduct constitutes a per se illegal tying arrangement or contract in violation of Section 1 of the Sherman Act.

150.    Defendants' conduct has caused Plaintiff both monetary and other damages.

## Cause of Action III
## Illegal Exclusive Contracts

151.    Plaintiff hereby repeats each and every allegation contained in the foregoing paragraphs.

152.    The relevant markets for the purposes of this claim are the general inpatient acute care hospital services and the outpatient surgery markets in the greater Rome area.

153.   Defendant Rome Hospital possesses market power in the market for general inpatient acute care hospital services.

154.   Defendant Rome Hospital has entered contracts with health plans for outpatient surgery on an exclusive basis.

155.   Defendants' conduct forecloses substantial numbers of patients from using RASC and unreasonably restrains competition in violation of Section 1 of the Sherman Act.

156.   Defendants' conduct has caused Plaintiff both monetary and other damages.

## Cause of Action IV
## Market Allocation

157.   Plaintiff hereby repeats each and every allegation contained in the foregoing paragraphs.

158.   The relevant markets for the purposes of this claim are the general inpatient acute care hospital services market, the outpatient surgery market, and the physician services markets in the greater Rome area.

159.   Plaintiff alleges on information and belief that Defendants Rome Hospital and/or GRA have agreed with the Cooperating physicians, that Defendant Rome Hospital would not compete with the Cooperating Physicians in the physician services market, and that the Cooperating Physicians would not compete with Rome Hospital in the outpatient surgery market and certain ancillary services markets.  Furthermore, Plaintiff alleges that these reciprocal agreements were entered into in order to effectuate the goals of the conspiracy between the Defendants and the Cooperating Physicians to eliminate RASC as a competitor.

160.   These agreements are per se illegal violations of Section 1 of the Sherman Act.

161.   Defendants' conduct has caused Plaintiff both monetary and other damages.

### Cause of Action V
### Conspiracy to Unreasonably Restrain Trade in the Outpatient Surgery Market

162.    Plaintiff hereby repeats each and every allegation contained in the foregoing paragraphs.

163.    The relevant market for the purposes of this claim is the outpatient surgery market in the greater Rome area.

164.    Defendants Rome Hospital and GRA have conspired with the Cooperating Physicians to engage in anticompetitive, exclusionary, and predatory conduct described above, and to use Defendant Rome Hospital's power in the market for general inpatient acute care hospital services to unreasonably restrain trade in the market for outpatient surgery in the greater Rome area.

165.    The conspiracy among Defendants and the Cooperating Physicians constitutes an illegal conspiracy to unreasonably restrain trade in violation of Section 1 of the Sherman Act.

166.    Defendants' conduct has caused Plaintiff both monetary and other damages.


### Cause of Action VI
### Monopoly Leveraging

167.    Plaintiff hereby repeats each and every allegation contained in the foregoing paragraphs.

168.    The relevant markets for the purposes of this claim are the general inpatient acute care hospital services and the outpatient surgery markets in the greater Rome area.

169.    Defendant Rome Hospital has monopoly power in the market for general inpatient general acute care hospital services in the greater Rome area.

170.    Defendant Rome Hospital has attempted, through the anticompetitive, exclusionary, and predatory conduct described above, to use its power in the market for general inpatient acute care hospital services to obtain an unfair competitive advantage in the market for outpatient surgery in the greater Rome area.

171.    There is no legitimate business justification for Defendants' conduct.

172.    Any justifications provided by defendant Rome Hospital for its conduct are merely pretextual.

173.    Defendants' conduct constitutes monopoly leveraging in violation of Section 2 of the Sherman Act.

174.    Defendants' conduct has caused Plaintiff both monetary and other damages.

### Cause of Action VII
### Attempted Monopolization of the Outpatient Surgery Market

175.    Plaintiff hereby repeats each and every allegation contained in the foregoing paragraphs.

176.    The relevant markets for the purposes of this claim are the general inpatient acute care hospital services and the outpatient surgery markets in the greater Rome area.

177.    Defendant Rome Hospital has monopoly power in the market for general inpatient general acute care hospital services in the greater Rome area.

178.    Defendant Rome Hospital has attempted, through the anticompetitive, exclusionary, and predatory conduct described above, to use its power in the market for general inpatient acute care hospital services to obtain monopoly power in the market for outpatient surgery in the greater Rome area.

179.    There is no legitimate, justifiable, or business justification for Defendants' conduct.

180.    Any justifications provided by Defendant Rome Hospital for its conduct are merely pretextual.

181.    As a result of Defendants' anticompetitive and exclusionary conduct, there is a dangerous probability that defendant Rome Hospital will obtain monopoly power in the market for outpatient surgery in the Rome area.

182.    Defendants' conduct was undertaken with the specific intent of destroying Plaintiff and creating a monopoly in the outpatient surgery market.

183.    Defendants' conduct has caused Plaintiff both monetary and other damages.

### Cause of Action VIII
### Monopolization of the Outpatient Surgery Market

184.    Plaintiff hereby repeats each and every allegation contained in the foregoing paragraphs.

185.    The relevant markets for the purposes of this claim are the general inpatient acute care hospital services and the outpatient surgery markets in the greater Rome area.

186.    Defendant Rome Hospital has monopoly power in the market for general inpatient acute care hospital services in the greater Rome area.

187.    Defendant Rome Hospital has, through the anticompetitive, exclusionary, and predatory conduct described above, used its power in the market for general inpatient acute care hospital services to obtain monopoly power in the market for outpatient surgery in the greater Rome area.

188.    With RASC's loss of its BlueCross contract on January 1, 2001, Defendant Rome Hospital obtained an overwhelming market share and monopoly power in the market for outpatient surgery in the greater Rome area.

189.     There is no legitimate, justifiable business justification for Defendants' conduct.

190.     Any justifications provided by Defendant Rome Hospital for its conduct are merely pretextual.

191.     Defendant's conduct constitutes the establishment of an illegal monopoly in violation of Section 2 of the Sherman Act.

192.     Defendants' conduct has caused Plaintiff both monetary and other damages.

**Cause of Action IX**
**Conspiracy to Monopolize the Outpatient Surgery Market**

193.     Plaintiff hereby repeats each and every allegation contained in the foregoing paragraphs.

194.     The relevant market for the purposes of this claim is the outpatient surgery market in the greater Rome area.

195.     Defendants Rome Hospital and GRA have conspired with the Cooperating Physicians to engage in anticompetitive, exclusionary, and predatory conduct described above, and to use Defendant Rome Hospital's power in the market for general inpatient acute care hospital services to obtain monopoly power in the market for outpatient surgery in the greater Rome area.

196.     There is no legitimate, justifiable business reason for Defendants' conduct.

197.     Any justifications provided by Defendants Rome Hospital and GRA for their conduct are merely pretextual.

198.     The conspiracy among Defendants and the Cooperating Physicians constitutes an illegal conspiracy or other unreasonable restraint of trade in violation of Section 2 of the Sherman Act.

199.     Defendants' conduct has caused Plaintiff both monetary and other damages.

Page 30 of 34

## Cause of Action X
### Intentional Interference with Contractual Relations

200.   Plaintiff hereby repeats each and every allegation contained in the foregoing paragraphs.

201.   Defendant Rome Hospital knew that RASC had a contract with BlueCross whereby BlueCross' Members could elect to have outpatient surgery performed at RASC.

202.   Defendant Rome Hospital intentionally induced BlueCross to terminate its contract with RASC in order to eliminate any significant competition from RASC, or to eliminate competition from RASC entirely by forcing RASC out of business.

203.   Defendant Rome Hospital unlawfully induced BlueCross to terminate its contract with RASC by offering to enter a contract with BlueCross that by its terms was predatory, exclusionary and anticompetitive.

204.   Defendant Rome Hospital's conduct caused Plaintiff both monetary and other damages.

205.   Defendant Rome Hospital's conduct constitutes tortious interference with an existing contract in violation of New York State law.


## Cause of Action XI
### Interference with Business Relations

206.   Plaintiff hereby repeats each and every allegation contained in the foregoing paragraphs.

207.   Defendant Rome Hospital entered into a contract with MVP that by its terms was predatory, exclusionary and anticompetitive.

208.    Defendant Rome Hospital's contract with MVP prohibited MVP from entering a contract with Plaintiff whereby MVP's Members could elect to have outpatient surgery performed at RASC.

209.    Defendant Rome Hospital employed anticompetitive, predatory and exclusionary means to induce MVP to enter an exclusive contract with Defendant, and not to enter a contract with RASC in order to eliminate the potential competition from RASC for providing outpatient surgery to MVP Members, or to eliminate competition from RASC entirely by preventing RASC access to the contracts with health plans that RASC would need in order to enter the market for outpatient surgery.

210.    But for Defendant Rome Hospital's interference, MVP would have entered into a contract with Plaintiff whereby MVP's Members could have elected to have outpatient surgery performed at RASC.

211.    Defendant Rome Hospital's conduct constitutes tortious interference with business relations in violation of New York State law.

212.    Defendants' conduct has caused Plaintiff both monetary and other damages.


**Request for Relief**

WHEREFORE, Plaintiff respectfully requests that this Court:

A.    Award Plaintiff three times its actual damages, estimated at $4,000,000, plus attorneys' fees and costs on Counts I through IX;

B.    Award Plaintiff compensatory and punitive damages on Counts X and XI;

C.    Order that Rome Hospital not enter into any contract with any health plans that by its terms would prevent the health plan from contracting with RASC or that would otherwise prevent RASC from being participating provider in the health plan;

D.      Order that the exclusivity provisions contained in Rome Hospital's contracts with MVP and BlueCross are invalid and unenforceable;

E.      Order that the exclusivity provisions be removed from Rome Hospital's contracts with MVP and BlueCross;

F.      Order that Rome Hospital not engage in any anticompetitive, predatory or exclusionary conduct with the intent, or likely effect of, substantially interfering with the business or business interests of RASC, RASC's owners, and/or RASC's medical staff;

G.      Order that Rome Hospital, GRA and their subsidiaries and affiliates do not conspire with physicians to divert patients away from, or to not refer patients to RASC or physicians that use RASC;

H.      Order that Rome Hospital not bundle its general inpatient acute care hospital services with its outpatient surgery services;

I.      Order that Rome Hospital not tie contracts or discounts for inpatient general acute care hospital services to contracts for outpatient surgery services;

J.      Order that Rome Hospital cannot consider a physician's ownership interest or investment in, or affiliation with, a competitor to Rome Hospital; or any other criteria not directly related to patient care or professional competence in determining whether or not to grant or renew medical staff privileges to any physician;

K.      Order that Rome Hospital not make any threats to any physician because of that physician's relationship with RASC, any of RASC's members or any other entity that competes with Rome Hospital;

L.      Order that Rome Hospital not interfere with contractual relations between RASC, RASC owners and members of RASC's medical staff with health plans, physicians, or other



health care professionals;

M.  Provide injunctive relief sufficient to ensure that Rome Hospital's contracts with

health plans do not exclude the participation of RASC or the physician-owners of RASC; and

N.  Order such other relief as it deems just and proper.

Roy A. Esnard
(NDNY Bar No. 508494)
WOOD & SMITH, P.C.
500 South Salina Street, Suite 1010
Syracuse, NY 13202
(315) 423-0400

William G. Kopit
Michael R. Bissegger
EPSTEIN BECKER & GREEN, P.C.
1227 25th Street, NW
Washington, DC 20037
(202) 861-0900

Dated: January 3, 2001.